UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| DANIEL W. RIVADA, | Case No. 17-cv-06895-LB |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: ECF Nos. 14, 21 |

## INTRODUCTION

Plaintiff Daniel Rivada seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act.[1] Mr. Rivada moved for summary judgment, and the Commissioner opposed the motion and filed a cross-motion for summary judgment.[2] All parties consented to magistrate-judge jurisdiction.[3] Under Civil Local Rule 16–5, the matter is submitted for decision by this court without oral argument. The court grants Mr. Rivada's motion

---

[1] Compl. – ECF No. 1 at 1; Administrative Record ("AR") at 10. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Motion – ECF No. 14; Cross-Mot. – ECF No. 21.

[3] Consent Forms – ECF Nos. 10, 11.

for summary judgment, denies the Commissioner's cross- motion for summary judgment, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On February 26, 2014, Mr. Rivada, then age 42, filed a claim for supplemental security income ("SSI") disability benefits under Title XVI of the Social Security Act, alleging severe anxiety, claustrophobia, and severe panic attacks. [4] He alleged an onset date of September 1, 2013.[5] The Commissioner denied the application initially on June 10, 2014, and on reconsideration on September 4, 2014.[6]

On October 30, 2014, Mr. Rivada requested a hearing.[7] On June 22, 2016, Administrative Law Judge David R. Mazzi (the "ALJ") held a hearing in Oakland, California.[8] Attorney Heather Freinkel represented Mr. Rivada.[9] Mr. Rivada and Christopher Salvo, a Vocational Expert ("VE"), testified in person.[10] On October 24, 2016, the ALJ issued an unfavorable decision.[11] Mr. Rivada appealed the decision to the Appeals Council.[12] The Appeal Council denied the request on October 2, 2017.[13] Mr. Rivada timely filed this action on December 1, 2017[14] and moved for summary

---

[4] *See* AR 47.

[5] *Id.*

[6] AR 49–72; 78–83.

[7] *See* AR 84–87.

[8] *See* AR 33.

[9] *See* AR 33–34.

[10] AR 33.

[11] AR 17.

[12] AR 88.

[13] AR 1.

[14] Compl. – ECF No.1.

United States District Court
Northern District of California

judgment.[15] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[16]

## 2. Summary of the Administrative Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 California Department of Corrections and Rehabilitation[17]

##### 2.1.1.1 Neil Hirsch M.D. — Treating

Dr. Hirsch saw Mr. Rivada multiple times from November 2015 through March 2016 while Mr. Rivada was incarcerated.[18] Mr. Rivada's intake records indicate that he sustained a wrist fracture due to a roofing accident.[19] The resulting surgery inserted eight screws and a metal plate in the right wrist.[20] Mr. Rivada is left-handed.[21]

On November 19, 2015, Dr. Hirsch noted that Mr. Rivada had "a scar secondary to his fusion surgery" on his right hand and that "[h]e ha[d] excellent grip and normal sensation and circulation."[22] Dr. Hirsch also wrote: "Status post fusion of the carpal bones of the right hand. That is distant. We are also ordering for completeness . . . an x-ray of the right hand."[23]

In December 2015, Dr. Hirsch saw Mr. Rivada for blood-pressure monitoring and reviewed x-rays of Mr. Rivada's right wrist.[24] He wrote: "Right hand x-ray shows a small old avulsion injury

---

[15] Mot. – ECF No. 14.

[16] Cross-Mot. for Summary Judgment – ECF No. 21.

[17] Mr. Rivada stated that he was incarcerated from approximately August 2014 through June 2016. He was incarcerated at Alameda County Jail, Shasta County Jail, and Deuel Vocational Institution in Tracy, CA before being transferred to California Correctional Institute in October 2015. He received ongoing health treatment while incarcerated. AR 277–78.

[18] AR 459–67.

[19] AR 586.

[20] *Id.*, *see, e.g.*, AR 42.

[21] AR 586.

[22] AR 467.

[23] *Id.*

[24] AR 462.

along the second metacarpal. There is a dorsal carpal fusion. There are mild degenerative changes and mild soft tissue swelling."[25] Mr. Rivada refused a follow-up appointment that was to take place on February 3, 2016.[26]

In March 2016, Dr. Hirsch saw Mr. Rivada a final time.[27] He noted Mr. Rivada's dyslipidemia and hypertension.[28] He noted that the dyslipidemia was improving and that Mr. Rivada would continue his medications.[29] Dr. Hirsch also noted that Mr. Rivada "refused any further monitoring" for hypertension and did not want any medications for hypertension.[30] Dr. Hirsch assigned a TABE score of 8.8 and reported Mr. Rivada had effective communication.[31]

### 2.1.1.2    Mental-Health Care

Mr. Rivada received mental-health care from providers while he was incarcerated. Mr. Rivada underwent an initial mental-health screening on June 2, 2015.[32] The clinician found, as one of the potential adjustment issues, that there were indications of "a major depression" and that Mr. Rivada suffered from a mental illness.[33] The clinician assigned a TABE score of no more than 4.0 which required him to refer Mr. Rivada to a mental-health professional.[34]

On June 2, 2015, in an initial health screening performed at Deuel Vocational Institution (DVI) after Mr. Rivada was transferred from Shasta County Jail, he presented with

---

[25] *Id.*

[26] AR 459.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* TABE scores "reflect an inmate's educational achievement level and are expressed in numbers reflecting grade level." *Marcelo v. Hartley*, No. CV 06-3705 CAS (SS), 2008 WL 4057003, *4 n.7 (C.D. Cal. Aug. 27, 2008). Subsequently, three doctors reported Mr. Rivada's TABE score as 6.3 and on one occasion Dr. Hirsch reported it as 8.8 (*See* AR 465, 556).

[32] AR 565.

[33] *Id.*

[34] *Id.*

hyperlipidemia, dysthymia, a sleep disorder, and anxiety.[35] Mr. Rivada reported "hearing voices or seeing things that [were] not there."[36] K Reynolds, a registered nurse ("RN"), recommended a referral to a mental-health professional.[37]

On June 15, 2015, Mr. Rivada saw Dr. Paula Williams, for a suicide-risk evaluation.[38] Dr. Williams opined that Mr. Rivada was not suicidal.[39] Dr. Williams assigned a Global Assessment of Functioning ("GAF") score of 60[40] and determined that Mr. Rivada met the criteria for inclusion in the Mental Health Services Delivery System ("MHSDS") based on "medical necessity."[41]

In August 2015, Z. Mora, PhD. also determined that Mr. Rivada met the criteria for inclusion in the MHSDS and assigned a GAF score of 62.[42]

In October 2015, Mr. Rivada had an initial health screening at the California Correctional Institute after he transferred there from DVI.[43] He reported having a "mental health illness" and being treated for depression in March 2015.[44]

---

[35] AR 518.

[36] AR 519.

[37] *Id.*

[38] AR 585–90.

[39] AR 590.

[40] "According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV"), a GAF of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers of co-workers. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000). GAF scores of 61 to 70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning, but the patient is generally functioning pretty well. *Id.*" *Turner v. Commissioner of Social Security,* No. 14-cv-04525-MEJ, 2015 WL 3546057 at n.1 (N.D. Cal., Jun. 5, 2015).

[41] AR 563.

[42] AR 562.

[43] AR 514–15.

[44] AR 515.

In October 2015, Mr. Rivada reported depression and anxiety, specifying his depression "to be a 2–3 on a 0–10 scale and his anxiety to be at a 6–7 on that same scale."[45] He reported that his depression and anxiety were more elevated, and he only slept two to three hours per night, when he was living on the street.[46] He had a problem with "racing thoughts."[47] In custody, he was sleeping an average of six hours per night.[48] He attributed his symptoms in part to being incarcerated and away from his family.[49] Under the DSM IV diagnoses, CSW A. Carrizales diagnosed him with adjustment disorder with anxiety, antisocial personality disorder, hyperlipidemia, and pyelonephritis.[50] The GAF score was 65.[51]

On November 14, 2015, Clinical Social Worker ("CSW") Carrizales confirmed that Mr. Rivada met the criteria for inclusion in the MHSDS, based on "medical necessity."[52]

Mr. Rivada saw psychiatrist O. Umugbe, PhD. three times from October 2015 to January 2016.[53] Each time, Dr. Umugbe noted that Mr. Rivada suffered from Adjustment Disorder with Anxiety and Antisocial Personality Disorder.[54] Dr. Umugbe assigned a GAF score of 64 or 65 during each session.[55]

Mr. Rivada saw Dr. Umugbe a final time on April 26, 2016.[56] At the session, Mr. Rivada rated his depression as a six or seven (out of ten) and anxiety as a seven or eight.[57] Mr. Rivada "fe[lt]

---

[45] AR 572.

[46] Id.

[47] Id.

[48] Id.

[49] Id.

[50] AR 573.

[51] Id.

[52] AR 561.

[53] AR 594–95, 597–98.

[54] AR 598.

[55] AR 582, 595, 597.

[56] AR 591.

[57] Id.

alright" and denied delusions.[58] Dr. Umugbe noted his good cognition and fair insight and judgment.[59] After the session, Dr. Umugbe increased Mr. Rivada's prescription for Vistaril (for anxiety) and renewed Mr. Rivada's prescription for Prozac (for depression).[60]

### 2.1.2 Rebecca Jedel, Ph.D. — Examining

On May 9, 2014, Dr. Jedel conducted a clinical examination of Mr. Rivada at the request of the Social Security Administration ("SSA").[61]

Mr. Rivada came to the appointment with a case worker from his shelter.[62] Dr. Jedel observed that Mr. Rivada "entered the room in an agitated manner, looking around and rubbing his hands on his legs.[63] He became tearful when she asked him personal questions and had difficulty talking about himself.[64] He did maintain his composure when he felt he was supported and was able to complete the interview."[65]

In describing Mr. Rivada's mental status, Dr. Jedel noted that he was unkempt, agitated, and anxious.[66] She reported that he was on "high alert."[67] He made eye contact rarely, his judgment and insight were "poor," and his thought process was "confused."[68] She noted that his speech, attention, intelligence were "within normal limits" and that he did not express suicidal ideation.[69]

During the examination Mr. Rivada "complained of pervasive anxiety, which impeded his daily life such that he cannot attend social event [sic], go out on public [sic], use public transit or

---

[58] *Id.*

[59] *Id.*

[60] AR 592.

[61] AR 372.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] AR 373.

[67] *Id.*

[68] *Id.*

[69] *Id.*

United States District Court
Northern District of California

attempt to work."[70] Mr. Rivada reported that he was severely beaten by his father throughout his childhood and was placed into foster care when he was a teenager.[71] He reported that he suffered from panic attacks, had poor sleep, almost no appetite, and racing thoughts, and was unable to concentrate. He constantly felt agitated.[72]

Under the DSM-IV, Dr. Jedel diagnosed Mr. Rivada with PTSD and Generalized Anxiety.[73] She noted Mr. Rivada's "fused wrist" and that he was "homeless" and "had a newborn child and limited access to healthcare."[74] Dr. Jedel assigned him a GAF score of 45 with an accompanying note of "serious symptoms."[75]

She opined that Mr. Rivada had "serious impairments" in all of the listed work-related activities:

1. Ability to understand, carry out and remember simple instructions
2. Ability to understand, carry out and remember complex instructions
3. Ability to maintain adequate attention/ concentration
4. Ability to maintain adequate pace or persistence to perform a) 1 or 2 step repetitive tasks, or b) complex tasks
5. Ability to respond appropriate[ly] [to] co-workers, a supervisor and public
6. Ability to respond appropriate[ly] to usual work situations (e.g. attendance, safety, etc.)
7. Ability to adapt to changes in routine work setting
8. Any limitations due to emotional impairments
9. Ability to manage money for own best interests[.][76]

---

[70] AR 372.

[71] *Id.*

[72] *Id.*

[73] AR 374.

[74] *Id.*

[75] *Id.*. "[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Garrison*, 759 F.3d at 1002 n.4.

[76] AR 375.

Mr. Rivada made eye contact rarely, his judgment and insight were poor, and his thought process was confused.[77] She noted that his speech, attention, and intelligence were "within normal limits" and he did not express suicidal ideation.[78]

### 2.1.3    Disability Determination Explanations — Non-Examining

During the administrative process, non-examining doctors conducted two disability determination explanations ("DDEs"), one related to his initial claim for disability and a second related to his claim at the reconsideration level.[79]

As part of the first DDE, K. Thai, a disability evaluations analyst summarized Mr. Rivada's medical history.[80] K. Thai also contacted Mr. Rivada by phone on May 27, 2014.[81] After the call he wrote the following summary:

> [Mr. Rivada] stated that he injured his wrist "sometime last year" and was seen for it briefly but has received no follow up care. He stated that the pain comes and goes and that it can be controlled [with over the counter] ibuprofen and medicinal marijuana. He stated that . . . it does not limit his ability to function/work. I informed him, if needed, we can schedule for an [orthopedic consultative examination], but [he] declined, stating that his pain is tolerable and controlled with ibuprofen/marijuana. I asked why then, did he say at the [consultative examination] that he is unable to engage in regular care due to pain. He stated that prior to the [examination] he did not take any pain meds or smoke marijuana to ease the pain.[82]

P. Davis, Psy. D., reviewed K. Thai's summary.[83] Dr. Davis found that Mr. Rivada's PTSD diagnosis "receive[d] no weight" because it was "not supported by signs."[84] Dr. Davis found that Dr. Jedel's opinion was "not supported" and gave it no weight.[85] Dr. Davis wrote that "[a]lthough this [claimant] may have been anx[ious], his condition is notconsidered to be severely limiting his

---

[77] AR 373.

[78] *Id.*

[79] AR 47–58, 59–67.

[80] AR 51–52.

[81] AR 51.

[82] *Id.*

[83] AR 53.

[84] *Id.*

[85] *Id.*

abilities."[86] Dr. Davis found that Mr. Rivada's anxiety-related disorders and substance addiction disorders did not meet the B or C criteria of listing 12.06 or 12.09.[87] J. Zheutlin, M.D. found Mr. Rivada's physical impairment to be "nonsevere."[88] The final determination in the DDE was that Mr. Rivada was not disabled.[89]

On reconsideration. D. Lee, M.D. write that based on the evidence, he "affirm[ed] the Initial assessment that [Mr. Rivada] had no severe physical" disability.[90] L. Colsky, M.D. noted that Mr. Rivada had six medically determinable impairments that were non-severe.[91] Dr. Colsky also found that Mr. Rivada's anxiety-related disorders and substance addiction disorders did not meet the B or C criteria of listing 12.06 or 12.09.[92] Dr. Colsky quoted Dr. Davis's earlier opinion that Mr. Rivada's PTSD diagnosis and Dr. Jedel's assessment should receive no weight.[93] The final determination was that Mr. Rivada was not disabled.[94]

## 2.2 Mr. Rivada's Testimony

At the June 22, 2016 hearing, Mr. Rivada was represented by an attorney.[95] The ALJ first asked Mr. Rivada about his prior work.[96] Mr. Rivada said that his prior work consisted of "stacking tires in trailers," and he did that job until he injured his leg falling off a trailer.[97] He did

---

[86] Id.

[87] AR 54. Paragraphs "A", "B", and "C" refer to the Listing requirements found in 20 CFR 404 subpart P 12.00. In those requirements, the applicant must possess factors described in both paragraphs "A" and "B", or paragraphs "A" and "C".

[88] AR 53.

[89] AR 56.

[90] AR 62.

[91] Id.

[92] AR 63.

[93] AR 64.

[94] AR 65.

[95] AR 33.

[96] AR 37.

[97] AR 37–38.

not have trouble getting along with the people he worked with at that job.[98] He testified that he was taking Prozac.[99]

Mr. Rivada's attorney then questioned him. Mr. Rivada testified that he dropped out of high school in "10th or 11th grade."[100] He described his symptoms of depression: "Sometimes I don't sleep or I don't want to eat. I start crying for no apparent reason. I'll want to do nothing but sleep and not eat. I'll maybe sleep, if I do, three or four hours."[101] He described feeling "helpless" and "worthless" because "I'm not there to help support myself or my son or fiancé, and it just makes me feel less of a person, of a man, of a father."[102]

Mr. Rivada then discussed symptoms of anxiety including "sweating [and] shortness of breath."[103] He said sometimes "[i]t feels like there's like 400 pounds sitting on my chest and I can't breathe."[104] He explained that he feels "anger because [he] can't control [himself] or the way [his] mind is" and "the way my mind races makes my anxiety worse."[105] He stated that he "can hardly sit still—twitching my fingers, restless legs, always twitching."[106] He experienced panic attacks when he felt "trapped or cornered" and it "[felt] like [his] back [was] against a wall—about three or four times a day—five times a day."[107] He noted that "[i]t's about the same" whether he is incarcerated or "outside" and that it's related to "being around a lot of people."[108]

---

[98] AR 38.

[99] *Id.*

[100] AR 39.

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] AR 40.

[108] *Id.*

Mr. Rivada testified that he had trouble concentrating.[109] "I lose my train of thought or I'll forget what I'm doing and I'll just sit there like, duh, and I'll stare. Every day I have trouble with it."[110] He also said that he had trouble getting along with other people.[111] It was "easier for [him] to just be alone, not say anything" and that he felt that way whether he was incarcerated or not.[112] He avoided other people to avoid conflicts with them.[113] He felt like he experienced "culture shock" when he left prison because "you have to act different in jail or prison."[114]

Mr. Rivada's medications made him "…feel tired a lot, and I'm always—I'm always hungry. Not matter how much I eat, I'll still eat…. Sometimes I feel, like, I don't know, zombie–like, like I can't pay attention and I'll just space out."[115]

Mr. Rivada also testified about his wrist injury.[116] He had a partial fusion wrist surgery in 2001 or 2002 that included "eight titanium screws and a titanium plate."[117] As a result, he "can't push, pull or lift anything over 30 or 35 pounds" and "[i]t starts bothering [him] when the weather gets really cold."[118] The injury was to Mr. Rivada's right wrist but he is left-handed.[119] He testified that the injury affected his ability to conduct fine-motor movements such as "writing, typing, or handling small objects."[120]

Mr. Rivada said that he had a hard time obtaining "ongoing access to medical treatment or mental health treatment" because he had trouble leaving his home when he had one, because of his

---

[109] Id.

[110] Id.

[111] Id.

[112] Id.

[113] AR 41.

[114] Id.

[115] Id.

[116] AR 42.

[117] Id.

[118] Id.

[119] Id.

[120] Id.

paranoia, and also had "been homeless a lot."[121] Being outside made him "paranoid, and [he] think[s] everybody's staring at [him] or they know that [he] had just gotten out of prison or jail or people know that something's wrong with him."[122]

### 2.3 Vocational Expert Testimony

Vocational expert Christopher Salvo testified at the hearing.[123] Based on Mr. Rivada's testimony, he classified his past temporary work stacking tires as "[u]nskilled with an SVP [specific vocational preparation] of 2[,] [n]ormally medium in nature, but, according to the records, he was doing heavy to very-heavy work, as he was lifting 100 pounds and possibly more."[124] There was no further examination or testimony.[125]

### 2.4 Administrative Findings

The ALJ followed the five-step sequential-evaluation process to determine whether Mr. Rivada was disabled and concluded that he was not.[126]

At step one, the ALJ found that that Mr. Rivada had not engaged in substantial gainful activity since he filed his application on February 26, 2014.[127]

At step two, the ALJ found that Mr. Rivada had two severe impairments: affective disorders and personality disorder.[128]

---

[121] AR 43.

[122] *Id.*

[123] AR 23.

[124] AR 43–44; Specific Vocational Preparation ("SVP") is defined "as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." On the SVP scale, a 2 refers to any training "beyond short demonstration up to and including 1 month." Dictionary of Occupational Titles, App. C, 1991 WL 688702 (4th ed. 1991).

[125] *See* AR 44.

[126] AR 20–28.

[127] AR 22.

[128] *Id.*

The ALJ did not find that Mr. Rivada had any physical impairments that were severe.[129] Specifically, regarding Mr. Rivada's wrist, the ALJ wrote:

> While 2013 records indicate that the claimant reportedly sustained a wrist fracture due to punching concrete years before,[130] *see* Exhibit 2F, and wrist x-rays dated November 23, 2015 confirmed a dorsal carpal fusion with mild degenerative changes, Neil Hirsch, M.D., found that this condition did not require further follow-up (Exhibit 9F at 15 and 20). There is no indication that claimant has had treatment for his wrist impairment since his application date. . . I note that the claimant did not allege [sic] physical impairments when he filed his application. Exhibit 2E.[131]

At step three, the ALJ found that Mr. Rivada did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[132] Specifically, the ALJ evaluated Mr. Rivada's impairments under listing 12.04.[133] He held that the evidence did not show marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, or repeated episodes of decompensation.[134] Rather, the ALJ found that Mr. Rivada had only mild restrictions of his activities of daily living, mild to moderate difficulties in social functioning, no episodes of decompensation, and mild difficulties with concentration, persistence, and pace.[135]

---

[129] *Id.*

[130] On May 29, 2013, while he was being treated at Tri-Health Center, Mr. Rivada reported punching "something concrete," resulting in a possible wrist fracture. AR 304. This appears to be a separate incident from the injury that required his wrist surgery in "2001 or 2002." AR 42.

[131] AR 22–23.

[132] AR 23.

[133] To meet the paragraph B criteria for listing 12.04, a claimant must demonstrate an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; (4) Adapt or manage oneself. 20 C.F.R. pt. 5, subpt. P, app'x 1. To meet the paragraph C criteria for listing 12.04, a claimant must have a "mental disorder . . . [that] is 'serious and persistent' . . ." and there must be "evidence of both (1) Medical treatment, mental health therapy, psychological support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms or signs of your mental disorder; and (2) Marginal adjustment, that is you have minimal capacity to adapt to changes in your environment or to demands that are not already party of your daily life." *Id.*

[134] AR 23.

[135] AR 24.

The ALJ reviewed the mental-health records from A. Carrizales, CSW, and Dr. Umugbe.[136] He wrote:

> Claimant's mental health treatment records are inconsistent with a Listing-level impairment or with a more restrictive residual functional capacity that found herein for any twelve-month period. The medical evidence of record shows that claimant was treated for dysthymia with prescribed Prozac and trazodone on April 30, 2015 (Exhibit 9F at 36). In an initial screening dated October 23, 2015, claimant denied feeling depressed more than half the time in the last two weeks. He denied suicidal ideation or homicidal ideation, and did not appear to have any difficulty understanding or responding to questions (Exhibit 8F at 106). On November 4, [2015], Oghenesume Umugbe, M.D., diagnosed claimant with an adjustment disorder with anxiety and an antisocial personality disorder. He prescribed fluoxetine and Remeron and assigned a [GAF] score of 65, consistent with mild symptoms . . . (Exhibit 9F at 59, 70, 73, and 77). From November 10 to April 26, 2016, Dr. Umugbe assigned GAF scores of 64, also consistent with mild symptoms (Exhibit 9F at 69). As discussed below, treatment records indicate that symptoms also have been a situational response to his incarceration. Treatment records show minimal treatment with mild symptoms that generally have been stable on medication.[137]

The ALJ "considered but assign[ed] little weight to the assessment of consultative examiner Rebecca Jedel, Ph.D., in light of the record as a whole."[138] The ALJ wrote:

> On May 9, 2014, Dr. Jedel performed a psychological consultative examination. Claimant appeared unkempt, agitated, anxious on high alert, with attention and intelligence within normal limits, but with memory limitations. Dr. Jedel's notes do not provide more specific observations to support her opinions. She diagnosed a [PTSD] and general anxiety disorder and assigned a GAF score of 45, consistent with severe symptoms. Dr. Jedel opined claimant would have serious limitations in all work-related abilities (Exhibit 6F at 1–4). I find that this opinion is contradicted by the weight of the additional evidence of record, including the records discussed above; it is based upon a one-time evaluation and appears to have relied in large part on the claimant's self-reported symptoms and limitations. Significantly, Dr. Jedel had not medical records to review. Exhibit 6F at 1.[139]

Referring to the DDEs the ALJ wrote, "[t]he State agency psychological and psychiatric consultants rejected [Dr. Jedel's] assessment and found that the claimant has no severe mental

---

[136] AR 23.

[137] Id.

[138] AR 24.

[139] Id.

impairment."[140]

In evaluating the "paragraph B" criteria of listing 12.04, the ALJ found Mr. Rivada had a mild restriction in daily living and concentration, persistence or pace, and a moderate difficulty in maintaining social functioning.[141] The ALJ found he "ha[d] experienced no episodes of decompensation which have been of extended duration" and "[t]he medical evidence of record indicates no episodes of decompensation."[142] The ALJ wrote: "Because claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation each of extended duration, the 'paragraph B' criteria are not satisfied."[143]

The ALJ also found that the "paragraph C" criteria of Section 12.04 were not satisfied: "The medical evidence does not demonstrate a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities…."[144]

At step four, the ALJ did not reach the issue of whether Mr. Rivada could perform past relevant work, because the ALJ found that he was not disabled.[145] The ALJ determined Mr. Rivada had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels.[146] But, the ALJ gave Mr. Rivada the "benefit of the doubt" and restricted him to "simple routine tasks equating to unskilled work."[147]

---

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] AR 27. The ALJ noted that "while claimant has three years of substantial gainful activity level income in the last 15 years, it is unclear that he had substantial gainful activity earnings from any single job, and it is not necessary to resolve this issue because the claimant is found not disabled at a later step of the evaluation process."

[146] AR 26.

[147] AR 25.

In reaching the conclusion, the ALJ followed a two-step process.[148] First, he determined whether there was "an underlying medically determinable physical or mental impairment . . .that could reasonably be expected to produce the type of the claimant's pain or other symptoms."[149] Second, the ALJ evaluated their "intensity, persistence, and limiting effects. . . . [w]henever statements about the intensity, persistence, or functionally limiting effects . . .are not substantiated by objective medical evidence, [the ALJ] must consider other evidence in the record to determine if claimant's symptoms limit the ability to do work-related activities."[150]

The ALJ found that while Mr. Rivada's impairments could cause the alleged symptoms he described, Mr. Rivada's "[s]tatements concerning the intensity, persistence and limiting effects of these symptoms are not found consistent with the medical evidence and other evidence in the record. . .."[151] The ALJ concluded that "[t]he medical evidence [did] not warrant a finding of a more restrictive residual functional capacity for any twelve-month period."[152]

The ALJ noted that the record contained no mental-health treatment records before October 2015, when Mr. Rivada began a mental-health treatment plan in prison with Dr. Umugbe and A. Carrizales, CSW.[153] The ALJ wrote that Mr. Rivada's mental-health records in prison "indicate he was cooperative, and mental status examinations consistently showed good cognition; they contain no reference to any significant social problems."[154] The ALJ wrote, "in general, the medical evidence shows depression that generally has been a situational reaction to his present incarceration but that is not reasonably shown to have been of such severity as to have precluded at least simple routine tasks."[155]

---

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] AR 25–26.

[152] AR 26.

[153] *Id.*

[154] *Id.*

[155] *Id.*

At step five, the ALJ held that Mr. Rivada's "limitations do not restrict him from meeting the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis."[156] The ALJ made the finding under Section 204.00 of the Medical-Vocational Guidelines,[157] noting Mr. Rivada "may be expected to perform [] the 2,500 medium, light, and sedentary occupations administratively noticed in the [guidelines]."[158] The ALJ concluded that, "considering [Mr. Rivada's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform," and therefore he was "not disabled."[159]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

---

[156] AR 27.

[157] The Medical-Vocational Guidelines (or, "the Grids") were created by the Secretary of Health and Human Services to assist in determining if a job exists for an individual with certain qualifications and disabilities. *Heckler v. Campbell*, 461 U.S. 458, 458 (1983).

[158] AR 27–28.

[159] AR 28.

"Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless."

*Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## APPLICABLE LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. See 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. See 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.

There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## APPLICATION

Mr. Rivada contends the ALJ erred by:

(1) failing to properly evaluate and weigh the opinion of examining psychologist Dr. Jedel;

(2) finding Mr. Rivada's wrist injury not severe, and failing to consider his physical impairment at step five;

(3) finding Mr. Rivada's testimony not credible; and

(4) failing to properly apply the Medical-Vocational Guideline rules.[160]

## 1. Whether the ALJ Erred by Discounting Dr. Jedel's Opinion

Mr. Rivada contends the ALJ provided insufficient grounds for rejecting Dr. Jedel's opinion.[161] The court agrees.

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

---

[160] Mot. – ECF No. 14.

[161] *Id.* at 9.

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating or examining doctor is contradicted by another opinion, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

An ALJ errs when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Garrison*, 759 F.3d at 1012–13. "[F]actors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a

whole[, and] the specialty of the physician providing the opinion . . .." *Orn,* 495 F.3d at 631. (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (an ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

Here, the ALJ rejected Dr. Jedel's opinion because it was contradicted by other evidence in the record, it was based on a one-time examination, it was based on Plaintiff's statements, and she did not have medical records to review.[162] The plaintiff argues that Dr. Jedel's opinion was uncontradicted, requiring the ALJ to provide clear and convincing reasons for rejecting it, and that none of the reasons cited meet that standard.[163] Dr. Jedel's opinion is contradicted by the opinions of the non-examining physicians contained in the DDEs.[164] Thus, the ALJ was required to give specific and legitimate reasons supported by the record for discounting the opinion. *Reddick*, 157 F.3d at 725. But the court holds that the ALJ did not meet this standard.

First, the ALJ rejected Dr. Jedel's opinion because it was "contradicted by the weight of the additional evidence of record. . .."[165] A review of the record reveals that this is not the case. Mr. Rivada was consistently diagnosed with and treated for various mental disorders.[166] . In summarizing the record, the ALJ focused on Mr. Rivada's denying suicidal or homicidal ideation and his ability to understand and respond to questions, as well as the relatively high GAF scores assigned by Dr. Umugbe and A. Carrizales.[167] He also repeatedly stated that Mr. Rivada's symptoms were "situational response[s] to his incarceration."[168] But Mr. Rivada's medical history contains consistent diagnoses of mental-health illnesses, including anxiety and depression.[169] In

---

[162] AR 24.

[163] Mot. – ECF No. 14 at 10.

[164] *Compare* AR 372–75 *with* AR 47–58 *and* 59–67.

[165] AR 24.

[166] AR 573 (adjustment disorder with anxiety, antisocial personality disorder), 585 (adjustment disorder with anxiety), 592 (same), 606 (polysubstance abuse, substance induced mood disorder, anxiety disorder).

[167] AR 23.

[168] *Id.*

[169] *See, e.g.,* AR 514, 419, 561, 565.

*Holohan v. Massanari*, the Ninth Circuit observed that the ALJ was "selective in his reliance on [claimant's treating physician's] treatment notes" and held that merely because "a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in the workplace." *Holohan*, 246 F.3d at 1205. Here, the ALJ was similarly selective in his reliance on instances of "mild symptoms" and did not consider the "overall diagnostic picture" reflected in Mr. Rivada's mental health treatment records. *Id.* This was not a valid basis for rejecting Dr. Jedel's opinion.

Second, the ALJ rejected the opinion because the examination was "based upon a one-time evaluation" and Dr. Jedel "had no medical records to review."[170] This reason is not legitimate because, as the plaintiff points out, "the Social Security Administration routinely orders and relies on consultative examinations like the one it paid Dr. Jedel to perform."[171] Basing rejection on the fact that it was a one-time evaluation was "'legally erroneous' because '[t]he ALJ's rationale would render all examining opinions superfluous, and [it] is contrary to the requirement that the ALJ consider all relevant evidence, including the medical opinions of examining doctors.'" *Brown v. Berryhill*, No. 17-02834 (JCS), 2018 WL 4700348 at 17 (N.D. Cal. September 29, 2018) (citing *Thompson v. Berryhill*, No. 17-305 (BAT), 2017 WL 4296971, at *5 (W.D. Wash. Sept. 29, 2017) (citing 20 C.F.R. § 416.945(a), which requires the ALJ to review "all of the relevant medical and other evidence")); *Sorg v. Astrue,* No. C09-5063 (KLS), 2009 WL 4885184, at *8 (W.D. Wash. Dec. 16, 2009) ("just because [the physician] saw and evaluated [the] plaintiff one time does not alone invalidate any findings or opinions based thereon, particularly as the Commissioner himself often relies on such one-time evaluations in determining a claimant's disability or lack thereof").

Third, the ALJ rejected Dr. Jedel's opinion because she appeared "to have relied in large part on the claimant's slef-reported symptoms and limitations." This was not a specific and legitimate reason supported by the record. "[W]hen an opinion is not more heavily based on a patient's self-

---

[170] AR 24.

[171] Mot. – ECF No. 14 at 11.

reports than on clinical observations, there is no evidentiary basis for rejecting the opinion."
*Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014). Dr. Jedel performed a "complete
psychological evaluation" on Mr. Rivada, resulting in the report submitted to the SSA.[172] There is
no evidence that Dr. Jedel's opinion and assignment of a GAF score of 45 was based primarily on
Mr. Rivada's self-reported symptoms, and not on her own evaluation.

In sum, the court holds that the ALJ did not provide specific and legitimate reasons for
discounting Dr. Jedel's opinions. *Garrison*, 759 F.3d at 1012. This error matters because Dr.
Jedel's opinion is essential context for the ALJ's determination that Mr. Rivada can "perform
work at all exertional levels."[173] Specifically, Dr. Jedel determined that Mr. Rivada's abilities to
"maintain adequate pace or persistence to perform (1) 1 or 2 step simple repetitive tasks [and] (2)
complex tasks," "respond appropriate[ly] to usual work situations," and "ability to adapt to
changes in routine work setting[s]," would all be seriously impaired.[174] If the ALJ properly
weighed Dr. Jedel's opinion regarding Mr. Rivada's serious impairments as related to his ability to
work, the ALJ's final determination might have been different.

The court thus remands for the ALJ's reconsideration of Dr. Jedel's opinion.

## 2. Whether the ALJ Erred by Finding Mr. Rivada's Testimony Not Credible

Mr. Rivada argues that the ALJ erred by discounting his testimony about his symptoms.[175] The
court agrees.

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d
at 1112. "'First, the ALJ must determine whether the claimant has presented objective medical
evidence of an underlying impairment which could reasonably be expected to produce the pain or
other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant
produces that evidence, and "there is no evidence of malingering," the ALJ must provide

---

[172] *See* AR 372–75.

[173] AR 27.

[174] AR 375.

[175] Mot. – ECF No. 14 at 12–13.

"specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id* (internal quotation marks and citations omitted).

"At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal punctuation omitted). "The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

The ALJ found that Mr. Rivada's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not found consistent with the medical evidence and other evidence in the record."[176] The ALJ did not identify specifically what portions of Mr. Rivada's testimony were not credible or specifically what evidence undermined his testimony regarding his symptoms. Thus, this did not constitute a specific, clear, and convincing reason for rejecting his testimony. *Burrell*, 775 F.3d at 1138.

### 3. Whether the ALJ Erred by Finding Mr. Rivada's Wrist Injury to be Non-Severe

Mr. Rivada argues the ALJ erred at step two of the five-step sequential process by finding that his wrist injury was not a severe physical impairment.[177]

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Smolen,* 80 F.3d 1273 at 1290. The ALJ must consider entire record, including evidence that both supports and detracts from its final decision. *Reddick,* 157 F.3d at

---

[176] AR 25.

[177] Mot. – ECF No. 14 at 13.

720. An impairment is not severe if it does not significantly limit the claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1521(a).[178] Basic work activities are "abilities and aptitudes necessary to do most jobs," including, for example, "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b).

The burden at step two is on the plaintiff and is a relatively low bar. The Ninth Circuit has held that "the step two inquiry is a *de minimis* screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137 at 153–54 (1987)). Thus, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Id.* (internal quotation marks omitted) (citing *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir.1988)).

The ALJ held that Mr. Rivada's wrist condition was not a severe physical impairment because his treating physician found no reason for further follow-up, and Mr. Rivada received no treatment for his wrist injury since his application date.[179] Mr. Rivada argues that this is an insufficient justification because "no evidence that any treatment exists that would improve Plaintiff's wrist condition."[180] But the record establishes that Dr. Hirsch examined Mr. Rivada over a period of time and diagnosed him with an "excellent grip and normal sensation and circulation" with only "mild degenerative changes" requiring no further treatment.[181] Also, when Mr. Rivada spoke with the disability evaluations analyst, he declined a referral to an orthopedist, stating his wrist pain was "tolerable and controlled" with ibuprofen and medical marijuana.[182] *See Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits").

---

[178] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, governs based on the date of the ALJ's hearing, June 22, 2016.

[179] AR 22.

[180] Mot. – ECF No. 14 at 14.

[181] AR 459; *see* AR 467.

[182] AR 51.

Given this record, the evidence as a whole supports the ALJ's determination that Mr. Rivada's wrist injury was non-severe. See *Reddick*, 157 F.3d at 720.

### 4. Whether the ALJ Erred by Determining that Mr. Rivada Could Perform Other Work

At step five, the burden shifts to the ALJ to determine whether the claimant can "make an adjustment to other work." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520). If the ALJ finds that the claimant can adjust to other work, he must then establish that there are a significant number of jobs in the national economy that the claimant can do." *Id.* This can be established by either referring to the Medical-Vocational guidelines (the "Grids") in 20 C.F.R., part 404, subpart P, appendix 2, or by taking testimony from a vocational expert. *Id.*

Here, the ALJ relied solely on the Grids in making his assessment. Whether or not this was proper depends on whether the Grids "accurately and completely describe the claimant's abilities and limitations." *Reddick*, 157 F.3d at 729 (citing *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985)). Whether this is true in this case, in turn, depends on the ALJ's determination of Mr. Rivada's abilities and limitations, which may or may not differ after reconsideration of the medical-opinion testimony. The court thus remands this issue for reconsideration too.

### CONCLUSION

The court grants Mr. Rivada's summary-judgment motion, denies the Commissioner's cross-motion, and remands the case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: January 18, 2019

_____
LAUREL BEELER
United States Magistrate Judge